Filed 2/21/23 P. v. Palaminos CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTONIO PRECIADO PALAMINOS,<br><br>    Defendant and Appellant. | F084305<br><br>(Super. Ct. No. MCR025574)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Madera County. Dale J. Blea, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Detjen, Acting P. J., Peña, J. and Smith, J.

Appointed counsel for defendant Antonio Preciado Palaminos asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief. Defendant responded, contending the trial court erroneously denied his second resentencing petition filed pursuant to Penal Code section 1172.6 (formerly § 1170.95).[1] He argues he lacked the intent to kill because he was intoxicated and therefore lacked the requisite degree of culpability required by new law. We affirm.

## PROCEDURAL SUMMARY

In 2007, following a court trial, the trial court found defendant guilty of five counts of second degree murder (§ 187, subd. (a); counts 1–5), five counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); counts 6–10), hit and run (Veh. Code, § 20001, subd. (a); count 11), two counts of vehicle theft (Veh. Code, § 10851, subd. (a); counts 12–13), attempted vehicle theft (§ 664; Veh. Code, § 10851, subd. (a); count 14), grand theft (§ 487, subd. (a); count 15), and driving without a license (Veh. Code, § 12500, subd. (a); count 16). As to each of the five gross vehicular manslaughter counts, the court found true an allegation that defendant had fled the scene (Veh. Code, § 20001, subd. (c)). (See *People v. Palaminos* (Apr. 30, 2009, F054625) [nonpub. opn.] at p. 2 (*Palaminos*).[2]

The trial court sentenced defendant to 75 years to life (five consecutive terms of 15 years to life) on the murder counts (counts 1–5), plus three consecutive years for hit

---

[1] All statutory references are to the Penal Code unless otherwise noted.

Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 with no substantive change. (Stats. 2022, ch. 58, § 10.) We will refer to the statute as section 1172.6.

[2] We take judicial notice of the records and our prior opinions in *Palaminos*, *supra*, F054625 and *People v. Palaminos* (Mar. 5, 2021, F080169) [nonpub. opn.].

and run, eight consecutive months for vehicle theft, and four consecutive months for attempted vehicle theft. The court stayed five 6-year terms for gross vehicular manslaughter, five enhancements for fleeing the scene, a two-year term for vehicle theft, and a two-year term for grand theft. (See *Palaminos*, *supra*, F054625, at p. 2.)

Defendant appealed, and in 2009, we affirmed. We concluded, for one thing, that sufficient evidence of implied malice supported defendant's second degree murder convictions on counts 1 through 5. (See *Palaminos*, *supra*, F054625, at pp. 13–14.)

Nearly 10 years later, on January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) went into effect. It amended sections 188 and 189, narrowed the scope of culpability for murder, and added section 1172.6. (See Stats. 2018, ch. 1015, §§ 1–4.)

On June 24, 2019, defendant filed a petition for resentencing pursuant to section 1172.6.

On September 26, 2019, the trial court summarily denied the petition because it concluded defendant was the actual killer.

On October 11, 2019, defendant filed a notice of appeal.

On March 5, 2021, we affirmed the trial court's denial of the petition.

On January 10, 2022, defendant filed a second resentencing petition.

On May 2, 2022, the trial court summarily denied the petition, finding no change in circumstances or law.

## **FACTS**

The following facts are from our first opinion:

"On July 3, 2006, 36-year-old Celia Berber and her family were visiting Celia's mother in Modesto. They left Modesto in their Toyota at about noon and headed for home in Lindsay. Celia was driving and her husband, Balentin Llerenas, sat in the front passenger seat. Their three children, sixteen-year-old Sulema Alvarez, 10-year-old Andoney Llerenas and four-year-old Brian Llerenas, were in the back seat.

3.

"A., an equipment driver with a special license to pull heavy equipment, decided to stop by his father's house on Road 29. A. was driving a Chevy heavy-duty pickup truck pulling a bulldozer on a trailer (together, the rig). A. was the only person who drove the truck, and he had attached the trailer and bulldozer himself. The trailer was a 'fifth wheel' or gooseneck trailer that sat over the truck's rear axle. The bulldozer was tied down to the trailer with binders and chains in both front and back, as required by law. When the truck was pulling weight, it was harder to stop, but the brakes on the truck and the trailer were regularly maintained and serviced. That day, A. had set the truck's brake controller to 7.5 out of 10 to accommodate the load he was pulling and the brakes were working well with the load.

"Shortly before A. arrived at his father's house, his relative, B., was outside the house. B. noticed a man across the street, about 45 feet away, looking into the neighbor's car. The man was thin and in his twenties. He was wearing a dark shirt and pants and was carrying some type of black bag. B. paid little attention because she thought the man was one of the neighbor's friends. She went back inside the house. Later, the neighbor's car was found in disarray.

"When A. arrived at his father's house, he parked the rig on the side of Road 29. He left the keys in the ashtray and the doors unlocked. He went in to check on his father and returned in 10 minutes to find the rig gone. He had not given anyone permission to take it. He looked down the road and saw the rig in the distance.

"C., a contractor in heavy equipment, was driving a full-sized pickup truck on Road 29 when he saw the rig about one-half mile away and approaching in the wrong lane. The rig rode on the shoulder of the wrong lane, crossed back to the other side of the road, and then almost ran off the shoulder on that side. The trailer was 'sliding.' Dust from the shoulder flew up from the back of the truck and the trailer. The rig then traveled in the proper lane as it approached C.'s truck. C. had slowed to about 25 miles per hour as he watched the rig. The rig again drifted completely into the wrong lane, traveling at a 'pretty fast pace,' and the vehicles were about one hundred yards apart. C. took evasive action, driving his truck entirely off the road and onto the shoulder. If he had not done so, the rig would have hit him head-on. As he drove off the road, C. thought the truck was going to hit his door panel directly, but then the truck drifted back into its lane, and C. thought the trailer and bulldozer would sideswipe his truck. C. looked directly at defendant because C. wondered if he knew the driver and if the driver even saw him there. Defendant's eyes were open wide and

4.

he 'looked like he was absolutely scared to death.' The trailer did not swerve, but it missed C.'s truck by about 12 inches. C. was grateful he had not been killed. C. continued to watch the rig as it passed and he saw no brake lights. He also heard no sound of the trailer braking, a distinctive sound with which he was very familiar. He watched the rig in his rearview mirror until it went over a hill and out of sight.

"D., a painting contractor, was painting the interior of a building on Road 29. At about 1:00 p.m., he went out to his van to start cleaning up. As he stood in the parking lot, he noticed the rig traveling at a 'pretty good rate of speed' on Road 29. He was concerned because he knew there was a stop sign up ahead at Avenue 12. After the rig went by, D. heard brakes lock up, followed by a crash. He looked up from his van and saw a car in flames. D. called 911 and drove toward the crash.

"Defendant had driven through the stop sign. The truck collided with the Toyota carrying Celia and her family and pushed it into the bridge rail. As the truck ran into the bridge rail, the trailer jackknifed and hit the car a second time. The car caught fire.

"E. was driving on Avenue 12, preparing to turn, when he suddenly saw the rig pushing the Toyota up against the rail. E. parked in front of D.'s van and got out. He saw defendant running away from the scene and in his direction. Defendant looked anxious and scared. E. told him he should go back to the accident. Defendant got angry and asked E. who he was and why he (defendant) had to answer to him. Defendant took off his shirt and cleaned some blood off his arms and shoulders. He said something nonsensical about his sister being there and he continued past E.

"E. ran to the scene and saw Celia on the ground beside the Toyota, which was in flames. E. and two other men pulled her away from the car. E. saw four burning figures still inside. Celia asked for water and someone poured water on her face. Celia told them her name, and the name and telephone number of her mother.

"D. saw defendant flag down a pickup truck with his shirt. Defendant got in the truck and it drove away.

"When F., a paramedic, arrived, the Toyota was still on fire and Celia was on the pavement. Celia was completely alert and oriented. She was aware of what was going on. She had a broken ankle and arm, and about 70 or 75 percent of her body had second and third degree burns. She told F. that 'some bastard had hit her with the … white truck and that he took off running and that the car caught on fire and everybody was still

inside.' She said the truck had cut in front of her. She told F. her name and told her to go help her children and husband. She said she could not believe what was happening; she was aware that her husband and children were still in the burning car. She kept telling F. not to help her, but to go help her children. She told F. she wanted to die. F. transported Celia to University Medical Center in Fresno.

"Celia's husband and three children, who had incurred various injuries in the collision, burned to death in the car. Later, Celia also died from her burns.

"An officer arrived to find the Toyota crushed against the rail and burned. Four burned figures remained inside. Celia had been taken to the hospital. A black T-shirt was hanging on the gooseneck portion of the trailer. In the debris field around the truck, the officer found a black CD case and various papers in the name of the neighbor who lived on Road 29. The papers included the neighbor's car registration.

"The accident investigation team determined that the truck hit the Toyota and pushed it sideways in the direction the truck was traveling and into the bridge rail. The truck was rated to carry 22,000 pounds and it was 8,467 pounds overweight at the time. This had a detrimental effect on its braking ability, as though the rig had been going 10 miles per hour faster than it was, but there was still ample distance (751 feet) for the rig to stop between the stop ahead sign and the stop sign. The approach to the sign was inclined and slightly curved. If defendant had merely taken his foot off the throttle at that point, the rig would likely have come to a stop at the sign.

"The speed limit on Road 29 was 55 miles per hour. Two digital security cameras on a nearby business allowed officers to calculate defendant's speed on Road 29 as between 61 and 65 miles per hour.

"The sensing and diagnostic module in the truck revealed that about five seconds before the air bags were deployed, the truck was going 61 miles per hour and the brakes were not in use. About three seconds before deployment, the truck was going 52 miles per hour and the brakes were activated. About two seconds before deployment, the truck was going 44 miles per hour and the brakes were still activated. Thus, defendant had attempted to stop the truck.

"At about 6:20 p.m. on the same day, an officer was dispatched to Mearl's Market. A male had reported being assaulted, but had hung up on the dispatcher without giving his name or any other information. When the

6.

officer entered the market, he could locate no victim and the clerk was aware of none. The officer exited and saw a blue Chevy van parked nearby. Defendant was sitting in the driver's seat. The officer asked him if he knew of any assault victims in the vicinity. Defendant said he had seen the victims walking down a particular street. The officer searched for the victims, then returned to the blue van where defendant was still sitting. Defendant was looking around inside the van. He was sweating and appeared nervous. He smelled strongly of alcohol, which was consistent with having consumed alcohol within the last hour or two. Defendant never told the officer he had been attacked, that he was running from anyone or that he was scared. The officer noticed some wires hanging underneath the steering column area and he thought defendant was trying to hot-wire the van.

"The officer recalled being briefed on a hit-and-run accident earlier in the day. The suspect had tattoos, scratches on his arms and was wearing Adidas shoes. The officer observed tattoos on defendant and asked him to lift up his sleeve. Defendant had long scratches on his left arm. When defendant removed his shirt, the officer saw a bruise on his neck and left chest area, which the officer recognized as the type sustained when wearing a seat belt during a vehicle collision. Defendant was wearing Adidas shoes. The officer arrested defendant, but did not inform him he was suspected of being involved in an accident in which people had died.

"F., the paramedic, was dispatched to Mearl's Market regarding an assault. When she arrived, two or more officers were present. F. administered medical aid to defendant, who claimed he had been beaten up by three men. He had multiple abrasions and bruising to his arms and chest. He had an abrasion to the left clavicle that was consistent with a seat belt mark and an automobile accident. Defendant was very rude. He made several remarks, even though no one was speaking to him. He said he did not understand why he was under arrest because he had not killed anyone and had not done anything. Defendant was slurring his speech, he smelled of alcohol and his eyes were red and glossy. F. asked him if he had been drinking or taking drugs, and he said he had not. Defendant was transported to the hospital by ambulance.

"An officer also observed that defendant smelled of alcohol and was unsteady on his feet. The officer believed defendant was under the influence of alcohol.

"An officer rode along in the ambulance. Defendant was smiling and appeared to be under the influence of alcohol. The officer saw no sign that defendant was under the influence of a stimulant or a narcotic. When

defendant was informed at the hospital about the death of the three children and their father, he smiled and laughed.

"A nurse in the emergency room spoke Spanish and was able to translate for the other nurses and the officers. When the nurse spoke to defendant, he told her that 'he had four tall beers, the 40 ounces, and that he had used meth that morning.'

"On cross-examination, the nurse explained more specifically that she asked defendant '[D]o you drink today[?]' and 'Do you use drugs[?]' Defendant said he drank four tall beers—his actual words were ' "Cuatro cervezas de la botella grande" '—and used methamphetamine. The nurse could not recall if she had asked him when he drank the beers. She did ask him when he used methamphetamine and he said he had used it that morning.

"A nurse's note in the medical records stated that defendant 'admit[ted] to drinking and methamphetamine use today[.] $20 bag of meth ingested by smoking and 4 tall beers[.]'

"Defendant's blood was drawn at 9:17 p.m. It contained 0.14 percent alcohol and 100 nanograms methamphetamine per milliliter.

"A criminalist testified as an expert on the effects of alcohol. The prosecutor presented the expert with a hypothetical question regarding a 150-pound male who started drinking at approximately 4:00 a.m. and finished drinking at approximately 11:00 a.m., consumed four 40-ounce malt liquors at six percent alcohol, and had a 0.14 percent blood-alcohol level at 9:17 p.m. The prosecutor asked the expert for his opinion regarding the male's blood-alcohol percentage at 1:00 p.m. The expert worked back from the 9:17 p.m. percentage and opined that the percentage at 1:00 p.m. would have been between 0.14 and 0.31. The prosecutor then asked the expert to consider the same question, but without considering the 9:17 p.m. percentage. The expert worked forward from the alcohol consumed and answered that the percentage at 1:00 p.m. would have been 0.18. The prosecutor asked the expert variations on these hypothetical questions.

"A toxicologist testified that defendant's blood would have contained about 200 nanograms per milliliter at about 1:00 p.m. The toxicologist testified that methamphetamine can impair a person's ability to drive, but the toxicologist could not form an opinion regarding whether defendant was impaired at the time he was driving because the toxicologist did not know when defendant ingested the methamphetamine, how much

8.

he ingested, how often he ingested it or any facts regarding his physical or mental performance that day. The toxicologist explained that the effect of methamphetamine in general is 'to rev your body up for action [like] the fight or flight reaction ….' It can make a person more alert and can counteract some of the effects of a central nervous depressant, such as alcohol.

"A few months before the collision, on May 11, 2006, at about 11:10 p.m., an officer stopped defendant after witnessing him back a van into the wrong lane of traffic. The officer observed that defendant had a strong odor of alcohol, slurred speech and red, watery eyes. Furthermore, defendant did not have a license. He said he had consumed two beers at about 6:30 that evening. The officer arrested defendant for driving under the influence and took him to jail.

"***Defense Evidence***

"Defendant testified that on July 3, 2006, he drank three 16-ounce King Cobra beers between about 8:00 and 9:00 a.m. He explained he was carrying a black CD case when he realized he was being followed by four gang members. He ran to the truck and drove away to save his life. He tried to brake before he got to the curve ahead of the stop sign, but the brakes did not work.

"After the collision, he ran to where he saw a friend, who drove him to a store and gave him ten dollars to buy beer. He bought two 40-ounce King Cobra beers and began to drink them. He saw the four gang members again and called the police to report that he was being beat up. He hid inside the van so the men would not find him. He tried to start the van so he could flee if necessary.

"On cross-examination, defendant admitted not having a driver's license. He did not remember telling officers that he did stupid things when he was drunk.

"***Rebuttal Evidence***

"An officer testified that when he interviewed defendant after his arrest, defendant first claimed that a friend named Jose had been driving the truck. Then defendant admitted crashing the truck. He admitted he was drunk at the time of the crash and he said he did stupid things when he was drunk. He said he drank four 16-ounce beers the morning of the collision. He said he got in the truck and adjusted the radio to his favorite station. Prior to the collision, he was traveling approximately 65 miles per hour.

9.

He did not mention being chased by anyone. He said he braked late going into the curve. After the collision, he was afraid of the fire and feared the truck would explode." (*Palaminos*, *supra*, F054625, at pp. 2–10, fns. omitted.)

## **DISCUSSION**

Defendant contends the trial court erred when it summarily denied his second section 1172.6 petition. After the first petition was denied, he claimed he was convicted under a natural and probable consequences theory that is no longer viable after Senate Bill 1437. That was incorrect. This time, he claims that, according to new law (*People v. Strong* (2022) 13 Cal.5th 698, 720 (*Strong*)), he has not been determined beyond a reasonable doubt to have the degree of culpability now required for murder under section 1172.6. He explains that he lacked the intent to kill because he was intoxicated, and he could not now be found guilty of murder. Thus, he contends, the trial court prejudicially erred when it failed to follow the procedure required by section 1172.6. As before, however, defendant continues to be ineligible for resentencing as a matter of law.

## I. Implied Malice Second Degree Murder

In our 2009 opinion in this case, we explained: " 'Murder is the unlawful killing of a human being … with malice aforethought.' [Citation.] 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.] Stated another way, '[m]alice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less.' (*People v. Knoller* (2007) 41 Cal.4th 139,

10.

143; see also *People v. Taylor* (2004) 32 Cal.4th 863, 868.) This is a subjective standard: the defendant must have *actually appreciated* the risk involved. (*People v. Watson* (1981) 30 Cal.3d 290, 297.) [¶] We conclude there was … sufficient evidence on the record at the end of the prosecution's case to support the finding of implied malice. Ample evidence established defendant was put on notice that his driving was dangerous to the lives of those around him and he continued to drive despite his awareness of the risk he posed. He drank alcohol and ingested methamphetamine that morning. He previously had been arrested for driving under the influence. He drove a stolen truck attached to a piece of heavy equipment, the handling and braking of which would naturally be different than an ordinary vehicle. He not only had no special license to operate the vehicle, he had no driver's license at all. He was in fact unable to control the rig, to the point that he could not keep it in the correct lane or even on the road. He nearly collided head-on with an oncoming driver, who had to take evasive action to prevent a potentially fatal collision. Defendant's fearful expression as he drove indicated he was aware of his inability to drive the rig safely. But, instead of slowing down or stopping the rig, he proceeded at a high speed, knowing he was unable to control the rig. He finally attempted to brake, but it was too late. He ran the stop sign and killed an entire family. We have no reservations regarding the quantum of evidence supporting the five murder convictions in this case." (*Palaminos*, *supra*, F054625, at pp. 13–14.)

## II. Senate Bill 1437

Senate Bill 1437, effective January 1, 2019, substantially modified the law governing accomplice liability for murder, significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *Strong*, *supra*, 13 Cal.5th at pp., 707–708; *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*)), and eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*)). Senate Bill 1437 was enacted to "amend the felony murder rule and the

11.

natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f).)

As amended by Senate Bill 1437, section 188, subdivision (a)(3), prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e). The latter provision requires the prosecution to prove specific facts relating to the defendant's individual culpability: The defendant was the actual killer (§ 189, subd. (e)(1)); the defendant, though not the actual killer, with the intent to kill, assisted in the commission of the murder (§ 189, subd. (e)(2)); or the defendant was a major participant in a felony listed in section 189, subdivision (a), and acted with reckless indifference to human life, " 'as described in subdivision (d) of … Section 190.2,' " the felony-murder special-circumstance provision. (*Strong*, *supra*, 13 Cal.5th at p. 708; see *Gentile*, *supra*, 10 Cal.5th at pp. 842–843.)

Senate Bill 1437 also added section 1172.6, which authorized an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of the changes Senate Bill 1437 made to the definitions of the crime. (See *Strong*, *supra*, 13 Cal.5th at p. 708; *Lewis*, *supra*, 11 Cal.5th at p. 957; *Gentile*, *supra*, 10 Cal.5th at p. 843.)

Then, in 2021, Senate Bill No. 775 (2021–2022 Reg. Sess.) extended the provisions of section 1172.6 to include convictions for attempted murder and manslaughter by modifying the law to "expand the authorization to allow a person who was convicted of murder under any theory under which malice is imputed to a person based solely on that person's participation in a crime … to apply to have their sentence vacated and be resentenced" (Legis. Counsel's Dig., Sen. Bill No. 775 (2021–2022 Reg.

12.

Sess.)) and to clarify "that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1(a).)

## III.   Analysis

To demonstrate prejudice from the denial of a section 1172.6 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent statutory errors, his petition would not have been summarily denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, defendant was not prejudiced by any failure in the court's procedure because, as in *People v. Delgadillo* (2022) 14 Cal.5th 216, 232, the record shows defendant was convicted of second degree murder under an actual implied malice theory (§ 187, subd. (a)) and gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)). (See *Delgadillo*, at p. 233 [no entitlement to relief under § 1172.6 where the petitioner was the actual killer and the only participant in the killing arising from a traffic accident that was prosecuted as second degree murder under an actual implied malice theory and as gross vehicular manslaughter while intoxicated].) Defendant was not an aider and abettor or a major participant; he was the *sole perpetrator* of the crimes and the actual killer. Further, defendant was not alleged to have aided and abetted another and was not convicted under either a felony murder or a natural and probable consequences theory, and malice was not imputed to him. He alone caused the fatal collision that killed an entire family. He is therefore ineligible for relief under section 1172.6 as a matter of law. (See § 1172.6, subd. (a) ["A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court" to have the conviction

13.

vacated]; see *Delgadillo*, at p. 233.)  Contrary to defendant's contention, *Strong* does not change his situation.[3]  In sum, defendant was not prejudiced by the summary denial of his petition.  (*Lewis*, at pp. 972–974.)

## **DISPOSITION**

The denial of defendant's section 1172.6 resentencing petition is affirmed.

---

**3**    Prior to *Strong*, the Courts of Appeal were split on the question of whether a special circumstance finding entered prior to *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 renders a petitioner ineligible for section 1172.6 resentencing relief as a matter of law. Our Supreme Court recently resolved this split and made clear that when a petitioner's case "was tried before both *Banks* and *Clark*, the special circumstance findings do not preclude him from making out a prima facie case for resentencing under section 1172.6." (*Strong*, *supra*, 13 Cal.5th at p. 721.)